**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**FOOD & WATER WATCH,**

          **Plaintiff,**

          **v.**

**DONALD J. TRUMP, in his official capacity as**
**PRESIDENT OF THE UNITED STATES,** *et al.*,

          **Defendants.**

          **Civil Action No. 17-1485 (ESH)**

---

## MEMORANDUM OPINION

      Plaintiff Food & Water Watch ("FFW") has sued Donald J. Trump in his official capacity as President of the United States and the U.S. Department of Transportation ("DOT") for establishing a de facto advisory committee to provide the White House and DOT with advice on infrastructure policy, in violation of the Federal Advisory Committee Act, 5 U.S.C. app. 2 §§ 1-16 ("FACA"). Defendants have moved to dismiss for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim under Rule 12(b)(6). The Court permitted limited discovery to resolve issues of fact related to subject-matter jurisdiction. Based on the record before the Court, it concludes that it does not have subject-matter jurisdiction, and therefore the motion to dismiss will be granted. The Court also will deny plaintiff's alternative motion to compel further discovery, finding that defendants' discovery responses are sufficient.

## BACKGROUND

### I.     PLAINTIFF'S ALLEGATIONS

      Plaintiff initiated this action on July 25, 2017 (Compl., ECF No. 1) and subsequently amended its complaint on November 20, 2017. (Am. Compl., ECF No. 11.) Plaintiff alleges

that President Trump "established an Infrastructure Council" in January 2017 "to advise himself

and DOT on matters related to infrastructure policy." (*Id.* ¶ 2.) According to plaintiff, the

Infrastructure Council was "created to monitor spending on the [Administration's] $1 trillion

Infrastructure Plan," and the council "has reviewed incoming project proposals and advised

Defendants on which projects to fund." (*Id.* ¶ 21.) Plaintiff alleges that the council was an

advisory committee subject to FACA and thus its private activities and membership comprised

only of the President's "business associates and friends" violated the law's membership and

transparency requirements. (*Id.* ¶ 1.)

Plaintiff points to public statements by the President, Secretary of Transportation Elaine

Chao, and alleged committee members Richard LeFrak and Steven Roth to support its allegation

that the council met with and advised the Administration on infrastructure policy beginning in

January 2017. (*See id.* ¶¶ 32-33, 35.) Before taking office, then-President-elect Trump

announced that LeFrak and Roth, both New York City real estate developers, had "already

agreed" to oversee an infrastructure committee. (*Id.* ¶ 22 (quoting Peter Grant & Ted Mann,

*Donald Trump Asks Richard LeFrak, Steven Roth to Monitor Infrastructure Plan's Costs*, Wall

St. J. (Jan. 16, 2017)).) According to the complaint, "[a] spokesman for LeFrak confirmed that

President Trump had made such a request; Roth later described himself as an 'advisor' for the

Infrastructure Council." (*Id.* (quoting Christian B. Bautisa, *Vornado's Roth: 'Board has a

robust succession plan if I get hit by a bus,'* Real Estate Wkly. (Feb. 15, 2017)).) At an event in

April 2017, "President Trump said that the Infrastructure Council, headed by his 'two friends'

LeFrak and Roth[,] would be working with Department of Transportation Secretary Chao to 'cut

a lot of red tape.'" (*Id.* ¶ 28(c) (quoting *Remarks by President Trump & Vice President Pence at

CEO Town Hall on Unleashing American Business*, The White House (April 4, 2017)).)

In February 2017, LeFrak stated that "[p]art of our assignment is to advise him [President Trump] as best we can on the merits of these different things" (*i.e.*, infrastructure spending).  (*Id.* ¶ 28(a) (quoting Sarah Mulholland & Mark Niquette, *Trump Ties to Infrastructure Advisers Roth, LeFrak Run Deep*, Bloomberg News (Feb. 15, 2017)).)  Around the same time, Roth told his company's shareholders:

> I'm honored that [President Trump] has asked me together with Richard LeFrak to be an advisor to him and the administration with respect to infrastructure matters. . . . I'm an advisor.  I'm not a line executive.  I'm not in any way an employee of the government. . . . I know this President means business, and I would hope that I and Richard LeFrak can make a difference.

(*Id.* ¶ 28(b) (quoting Transcript of Vornado Realty Trust's CEO Steven Roth on Q4 2016 Results Earnings Call (Feb. 14, 2017)).)  In March 2017, LeFrak characterized the council as a group of "gentlemen on the little unofficial advisory council."  (*Id.* ¶ 27 (quoting Richard LeFrak, Mornings with Maria, *Fixing U.S. Infrastructure*, Fox Bus. Network (Mar. 13, 2017)).)

Plaintiff alleges that Joshua Harris and William E. Ford, both private equity executives, later joined the Infrastructure Council.  (*Id.* ¶ 25 (citing E.B. Solomont, *New York Eyes Outsized Share of $1 Trillion Prize*, The Real Deal (March 1, 2017)).)  In May 2017, Secretary Chao publicly discussed the council during an on-air interview with LeFrak:

> I want to compliment the infrastructure council, you know, because these are leading thought leaders in our country.  Richard and others, Steve Roth, Josh Harris, Bill Ford.  They are volunteers.  They have given up their time and their life's experience and finding the best way to build our infrastructure for the future.

(*Id.* ¶ 29 (quoting Interview with Elaine Chao & Richard LeFrak, *Rebuilding America with Transportation Secretary Chao & Richard LeFrak*, CNBC (May 1, 2017)).)

On July 19, 2017, the President issued Executive Order No. 13805 ("EO 13805"), announcing the establishment of a "Presidential Advisory Council on Infrastructure."  (Am. Compl. ¶ 39.)  EO 13805 defined the council's "mission":

> The Council shall study the scope and effectiveness of, and make findings and recommendations to the President regarding, Federal Government funding, support, and delivery of infrastructure projects in several sectors, including surface transportation, aviation, ports and waterways, water resources, renewable energy generation, electricity transmission, broadband, pipelines, and other such sectors as determined by the Council.

Exec. Order 13805 § 4, 82 Fed. Reg. 34383, 34383 (July 19, 2017). However, shortly thereafter, in August 2017, the White House announced that plans for the council (as well as other councils) would not move forward, and on September 29, 2017, President Trump signed Executive Order No. 13811, revoking EO 13805. (*See* Am. Compl. ¶¶ 40-41; Exec. Order 13811 § 3, 82 Fed. Reg. 46363, 46365 (Sept. 29, 2017).)

Notwithstanding the ultimate dissolution of the planned committee, plaintiff claims that the Administration "formally adopted a variety of policy recommendations" made by the Infrastructure Council (*see* Am. Compl. ¶ 3) and developed a non-public 70-page memorandum on the Administration's plans for infrastructure policy. (*See id.* ¶ 38 (citing Steven Overly, *Cordish: White House Talking with Musk, Prepping Infrastructure Plan*, PoliticoPro, Nov. 13, 2017)).) And, although plaintiff initially claimed that the council was an advisory committee within the meaning of FACA, plaintiff amended its complaint after EO 13805 was revoked to claim that the Infrastructure Council was a "de facto" FACA committee.

## II.  DEFENDANTS' MOTION TO DISMISS AND SUPPLEMENTAL BRIEFING

Defendants have moved to dismiss the amended complaint for lack of subject-matter jurisdiction and failure to state a claim pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (Defs.' Mot. to Dismiss, Jan. 17, 2018, ECF No. 14.) Defendants' primary argument is that plaintiff cannot establish standing because no FACA committee ever existed, and the Court therefore lacks subject-matter jurisdiction over plaintiff's claims. (*See* Defs.' Mem. in Support of Mot. to Dismiss ("Mot."), Jan. 17, 2018, ECF No. 14-1.) Defendants appended to their first motion to dismiss a declaration by Reed S. Cordish, then-Assistant to the President for

Intergovernmental and Technology Initiatives, stating that only "preliminary discussions" took place regarding the Infrastructure Council. (*See* Decl. of Reed S. Cordish ("Cordish Decl."), ECF No. 8-2 ¶ 5.) Thus, while defendants acknowledge that the President "was interested in establishing a new infrastructure advisory council," they argue that the initial activities of various private individuals and government officials did not constitute FACA meetings because no group policy recommendations were solicited or rendered. (Mot. at 3 (citing Cordish Decl. ¶ 4).) According to Cordish, "White House staff, together with the four identified potential council members and Department of Commerce staff, had some preliminary discussions regarding the anticipated infrastructure advisory council, including discussions of how such a council would operate and what the mission of such a council would be." (Cordish Decl. ¶ 5.)

These discussions led to the issuance of EO 13805, "authorizing the establishment of a Presidential Advisory Council on Infrastructure in the Department of Commerce." (Mot. at 3 (citing EO 13805 § 2, 82 Fed. Reg. 34383).) Prior to the issuance of EO 13805, the Administration anticipated that "a charter would be executed that would describe the anticipated council's operation and the responsibilities of its members in greater detail . . . before any members were appointed to the anticipated council and before it began operating as an advisory council." (Cordish Decl. ¶ 6.) According to Cordish, this process of drafting a charter began in April 2017 and was abandoned before a charter was finalized and before any members were officially appointed. (*Id.* ¶¶ 6, 8; *see also* Declaration of James W. Uthmeier ¶ 8, ("Uthmeier Decl.") ECF No. 8-3.)

In opposition, plaintiff argued that the Court should not consider the Cordish Declaration without permitting limited jurisdictional discovery to determine whether a FACA committee had existed. (*See* Pl.'s Mem. in Opp'n to Defs.' Mot. to Dismiss ("Opp'n"), Feb. 14, 2018, ECF No. 16 at 16-18.) The Court subsequently ordered plaintiff to supplement its brief and address

whether it had "at least a good faith belief that [jurisdictional] discovery will enable it to show

that the court enjoys jurisdiction over the suit" and to "make a detailed showing of what

discovery it wishes to conduct [and] what results it thinks such discovery would produce."

(Order, May 7, 2018, ECF No. 19 at 1 (quoting *Judicial Watch, Inc. v. Tillerson*, 293 F. Supp. 3d

33, 47 (D.D.C. 2017) (quoting *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d

1343,1352 (D.C. Cir. 2000))).)

    After reviewing the parties' pleadings, the Court determined that limited jurisdictional

discovery was appropriate and ordered plaintiff to submit proposed interrogatories that were

narrowly tailored, consistent with *Cheney v. U.S. Dist. Ct. for Dist. of Columbia*, 542 U.S. 367

(2004). (*See* Order, May 23, 2018, ECF No. 23 at 1.) The Court also instructed plaintiff to bear

in mind the D.C. Circuit's subsequent en banc ruling in *In re Cheney*, which stressed the narrow

application of FACA:

> Congress could not have meant that participation in committee meetings or
> activities, even influential participation, would be enough to make someone a
> member of the committee . . . . Separation-of-powers concerns strongly support
> this interpretation of FACA. In making decisions on personnel and policy, and in
> formulating legislative proposals, the President must be free to seek confidential
> information from many sources, both inside the government and outside.

406 F.3d 723, 728 (D.C. Cir. 2005).

    Plaintiff proposed an extensive list of interrogatories (Pl.'s 1st Set of Interrogatories

Related to Jurisdictional Discovery to Defs., May 29, 2018, ECF No. 24), to which defendants

objected. (Notice of Objections to Pl.'s Proposed Interrogatories, June 4, 2018, ECF No. 25).

The Court held a hearing at which it rejected plaintiff's proposed interrogatories as amounting to

"unbounded" discovery in violation of the Supreme Court's holding in *Cheney*, but instead, it

proposed more limited interrogatories targeted to resolving the issue of whether "a FACA

committee existed de facto or otherwise." (Tr. of Hearing, June 6, 2018, ECF No. 29 at 2-3; *see*

*also Cheney*, 542 U.S. at 397.)  The interrogatories, which were edited and agreed to by the

parties (*see* Tr. of Hearing at 3 *et seq.*), were as follows:

1. Between January and August 2017, did any meeting occur involving non-government individuals[1] and government employees or only non-government individuals, in which recommendations or advice regarding infrastructure policy was proposed by, or on behalf of, a group or solicited from a group including two or more non-government individuals for the President, Secretary Chao, the Deputy Transportation Secretary, or persons from the White House, the Office of American Innovation, or the Department of Transportation's political appointees, including acting officials, and their staff?

2. If so, identify the dates of those meetings and all non-government participants.

3. If so, did any non-government individual have the right to vote or veto any drafted or proposed recommendation, advice, or report?

4. If so, did any non-government individual in fact vote on or veto any recommendation or draft any portion of a final or preliminary committee report?

5. Was any recommendation, advice, or report regarding infrastructure policy drafted, proposed, or issued by, or on behalf of, the group as a result of these meetings?

6. Explain what the "preliminary discussions" that Reed Cordish referred to in ¶ 5 of his declaration involved.  Did they consist of meetings, conference calls, or some other form of communication?  State the dates of any discussions, identify any non-government individual who participated, and summarize what was discussed during these "preliminary discussions."

7. Was any recommendation, advice, or report regarding infrastructure policy drafted, proposed, or issued by, or on behalf of, the group as a result of these "preliminary discussions"?

8. Did any non-government individual have the right to vote on or veto any recommendation, advice, or report associated with these "preliminary discussions"?

(Order, June 6, 2018, ECF No. 26 at 1-2.)

---

[1] "Non-government individuals" is defined as Richard LeFrak, Steven Roth, Joshua Harris, and/or Bill Ford.

Defendants filed a supplemental brief and responded to the interrogatories. (Defs.' Supp. Brief in Support of Defs.' Mot. to Dismiss ("Defs.' Supp. Brief"), July 23, 2018, ECF No. 28; Defs.' Responses to Interrogatories Set Forth in Court's Order of June 6, 2018 ("Defs.' Resp. to Interrog."), ECF No. 28-1.) Citing separation-of-powers concerns and the presidential communications privilege, defendants objected to various aspects of the jurisdictional discovery, especially "any discovery directed to the President of the United States or other senior Government officials who advise him." (Defs.' Supp. Brief at 1.) Defendants nonetheless responded to each of the interrogatories, based on a "review of calendar records and e-mail of the individuals . . . other than the President himself, who have been identified by Defendants as likely to have had meetings with any of the non-government individuals in connection with an infrastructure council, and consultation with those individuals to the extent feasible." (Defs.' Resp. to Interrog. at 9.) As part of this review, Cordish and D.J. Gribbin, both former White House Office employees involved in planning the committee and who no longer work at the White House, were contacted. (*See id.* at 16.)

In response to Interrogatories 1-5, defendants stated that they had "identified no meeting that meets the criteria described," *i.e.*, no meeting involving LeFrak, Roth, Harris, and/or Ford "in which recommendations or advice regarding infrastructure policy was proposed by, on or behalf of, a group or solicited from a group" including two or more non-government individuals. (*Id.* at 9-11.) In response to Interrogatory 6, which asked about the "preliminary discussions" referenced in the Cordish Declaration, defendants explained that the discussions involved identification of LeFrak and Roth as the leaders of the planned council and identification of potential members; discussion of how the anticipated council would be formed and would operate; focus on administrative issues and logistical matters, including FACA compliance and council-member vetting; and discussion of "specific infrastructure policy issues" in order to

determine "what the council's mission would be" and "what the end product of the council's work would be." (*Id.* at 12-13.) The response identified thirteen such "preliminary discussions" involving one or more of the alleged council members, including in-person meetings, emails, and phone calls. (*Id.* at 13-14.) Only one was an in-person meeting including all four alleged members, held on March 22, 2017. (*See id.* at 13.) One other in-person meeting, involving Harris and Ford and White House personnel, occurred on April 19, 2017. (*Id.*) The remaining eleven contacts were conference calls, emails, email exchanges, or "communications." (*Id.* at 13-14.) Defendants also asserted in response to Interrogatories 7 and 8 that "[n]o draft, proposal, or issuance of any group recommendation, advice, or report regarding infrastructure policy as a result of these 'preliminary discussions' has been identified," and thus no non-government individual had a "vote on or veto in" any group recommendations. (*Id.*)

Defendants qualified their responses by stating that, because both Cordish and Gribbin no longer worked at the White House Office, their availability was limited. (*Id.* at 13.) Similarly, in a Verification appended to the responses, White House Information Technology Director Charles C. Herndon stated that the "complete accuracy" of the responses could not be guaranteed because Cordish and Gribbin "no longer work for the government and are outside the White House's control"; however, Herndon verified "that officials from the White House Office undertook a process to ensure the accuracy of these interrogatory responses to the best of their ability," including by "consulting with" Gribbin and Cordish. (*Id.* at 16.)

In its opposition, plaintiff argues that the complaint and the interrogatory responses support a finding that a de facto advisory committee existed. (*See* Pl.'s Supp. Opp'n to Defs.' Mot. to Dismiss or, in the Alternative, Mot. to Compel ("Pl.'s Supp. Opp'n"), Aug. 31, 2018, ECF No. 31.) Plaintiff also contends that defendants' responses to the interrogatories are insufficient, and asks, as an alternative to granting defendants' motion to dismiss, that defendants

9

be compelled to provide further jurisdictional discovery. (*See id.*) Defendants filed a reply in support of their supplemental briefing and opposed the motion to compel. (*See* Defs.' Supp. Reply in Support of Defs.' Mot. to Dismiss & Mem. in Opp'n to Pl.'s Alternative Mot. to Compel ("Defs.' Supp. Reply"), Sept. 28, 2018, ECF No. 33.)

The question now to be decided is whether plaintiff has sustained its burden to proffer sufficient evidence of a de facto advisory committee within the meaning of FACA so that the Court may exercise subject-matter jurisdiction.

## LEGAL STANDARDS

### I.     STANDING AND JURISDICTION

To establish Article III standing, a plaintiff must demonstrate that (1) they have suffered an injury-in-fact, (2) the injury is fairly traceable to the defendant's challenged conduct, and (3) the injury is likely to be redressed by a favorable decision. *See NB ex rel. Peacock v. Dist. of Columbia*, 682 F.3d 77, 81 (D.C. Cir. 2012) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). A plaintiff may establish an injury-in-fact under a theory of "informational injury" by showing that he or she was not able "to obtain information which must be publicly disclosed pursuant to a statute." *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 21 (1998); *see also Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 23 (D.C. Cir. 2011) (recognizing this theory of "informational standing"). Failure to comply with the requirements of FACA gives rise to such an injury. *See Pub. Citizen v. DOJ*, 491 U.S. 440, 449 (1989) ("[R]efusal to permit appellants to scrutinize [the committee's] activities to the extent FACA allows constitutes a sufficiently distinct injury to provide standing to sue."); *Byrd v. EPA*, 174 F.3d 239, 243 (D.C. Cir. 1999) ("According to the Supreme Court, a refusal to provide information to which one is entitled under FACA constitutes a cognizable injury sufficient to establish Article III standing.").

On a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1), "the court may consider the complaint supplemented by undisputed facts evidenced in the record, or . . . by undisputed facts plus the court's resolution of disputed facts." *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (quoting *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992)); *see also Ctr. for Biol. Diversity v. Tidwell*, 239 F. Supp. 3d 213, 219 (D.D.C. 2017) ("[T]he factual allegations in the complaint will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim.") (internal quotation marks and citation omitted). Where a defendant's motion to dismiss attacks "the factual basis of the court's jurisdiction," jurisdictional discovery is appropriate to assist the Court in resolving issues of fact relevant to standing. *Phx. Consulting, Inc. v. Rep. of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000).

## II.     FEDERAL ADVISORY COMMITTEE ACT

FACA was enacted in 1972 "to ensure that new advisory committees be established only when essential and . . . that their creation, operation, and duration be subject to uniform standards and procedures; that Congress and the public remain appraised of their existence, activities, and cost; and that their work be exclusively advisory in nature." *Pub. Citizen*, 491 U.S. at 446 (citing 5 U.S.C. app. 2 § 2(b)). To achieve this goal, FACA mandates that every advisory committee "file a charter before meeting or taking any action, hold its meetings open to the public, publish timely notice of each such meeting in the Federal Register, keep minutes and other records of its meetings, and allow interested persons . . . to attend, appear before, or file statements with the committee." *Am. Civil Liberties Union v. Trump* ("*ACLU*"), 266 F. Supp. 3d 133, 135 (D.D.C. 2017) (citing 5 U.S.C. app. 2 §§ 9(c), 10(a)(1), 10(a)(2), 10(a)(3), 10(c)). Advisory committees must also make available for public inspection and copying the various records, reports, meeting minutes, and any other documents "which were made available to or prepared for and by" the

advisory committee. 5 U.S.C. app. 2 § 10(b). Additionally, an advisory committee must "be 'fairly balanced in terms of the points of view represented and the functions to be performed,' and 'not be inappropriately influenced by the appointing authority or by any special interest.'" *ACLU*, 266 F. Supp. 3d at 135 (quoting 5 U.S.C. app. 2 §§ 5(b)(2)-(3)).

Given the serious separation-of-powers concerns inherent in legislation that imposes requirements on executive decision-making, courts interpret FACA narrowly. The executive may, of course, consult with private advisors or stakeholders without triggering FACA. The Supreme Court has therefore admonished that "FACA was enacted to cure specific ills . . . ; although its reach is extensive, we cannot believe that it was intended to cover every formal or informal consultation between the President or an Executive agency and a group rendering advice." *Pub. Citizen*, 491 U.S. at 453 & n.8. The key question is whether group advice, as opposed to individual advice, is sought or rendered. *See, e.g.*, *Ass'n of American Physicians & Surgeons, Inc. v. Clinton* ("*AAPS*"), 997 F.2d 898, 913-14 (D.C. Cir. 1993).

## ANALYSIS

### I. DEFENDANTS' MOTION TO DISMISS

#### A. What Is a FACA Advisory Committee?

To determine if FACA applies, it must be determined whether a de facto advisory committee existed before the President revoked EO 13805. FACA defines an advisory committees as "any committee . . . established or utilized by the President, or . . . by one or more [federal] agencies, in the interest of obtaining advice or recommendations for the President or one or more agencies or officers of the Federal Government." 5 U.S.C. app. 2 § 3(2). Despite this "imprecise definition," courts narrowly construe FACA's reach. *Nader v. Baroody*, 396 F. Supp. 1231, 1233 (D.D.C. 1975); *see also Pub. Citizen*, 491 U.S. at 452-53, 463-4 (rejecting a "literalistic reading" of the terms "establish" and "utilize" because Congress could not have

intended FACA to apply "to any group of two or more persons, or at least any formal organization, from which the President or an Executive agency seeks advice").  The question of whether a group has been "established or utilized" by the executive is thus subject to "narrow interpretation"; a committee is deemed to be "established" when it has been "actually formed" by the executive or a government agency (and not by some other entity), and it is deemed to be "utilized" if the executive exercises "management and control" over the group's membership and mission.  *Byrd*, 174 F.3d at 245-48.

"It is a rare case when a court holds that a particular group is a FACA advisory committee over the objection of the executive branch."  *AAPS*, 997 F.2d at 914.  Although courts on occasion have found FACA liability despite arguments by the executive that the law did not apply, *see, e.g.*, *Nw. Forest Res. Council v. Espy*, 846 F. Supp. 1009 (D.D.C. 1994) (holding that a group of "technicians who supply decisionmakers with data" was an advisory committee subject to FACA); it is far more often that the government prevails in such cases.  *See, e.g.*, *Judicial Watch, Inc. v. Clinton*, 76 F.3d 1232, 1233-34 (D.C. Cir. 1996) (holding that a "Presidential Legal Expense Trust" was not subject to FACA); *Ctr. for Biol. Diversity*, 239 F. Supp. 3d at 224-25 (holding that non-government scientists were not de facto advisory committee members); *Freedom Watch, Inc. v. Obama*, 930 F. Supp. 2d 98, 102 (D.D.C. 2013) (holding that health policy "stakeholder" meetings did not create a de facto FACA advisory committee).  Thus, although a de facto advisory committee may be a viable theory, at a minimum, it is difficult to prove.[2]

---

[2] *But see In re Cheney*, 334 F.3d 1096, 1117-18 (D.C. Cir. 2003) (Randolph, J., dissenting) (arguing that "the *de facto* member doctrine" should be "cast aside," and emphasizing the "constitutional difficulties" posed by the de facto FACA committee theory), *vacated by Cheney*, 542 U.S. 367.

To determine whether a de facto FACA advisory committee exists, courts look to whether the purported committee has been "asked to render advice or recommendations, *as a group*, and not as a collection of individuals." *AAPS*, 997 F.2d at 913. The collective judgment of the group is essential to the inquiry:

> The group's activities are expected to, and appear to, benefit from the interaction among the members both internally and externally. Advisory committees not only provide ideas to the government, they also often bestow political legitimacy on that advice. . . . Advisory committees are not just mechanisms for transmitting policy advice on a particular subject matter to the government. These committees also possess a kind of political legitimacy as representative bodies.

*Id.* at 913-14.

Plaintiff argues that the Infrastructure Council is subject to FACA because it had an organized structure, a fixed membership, and a specific purpose. It is true that these characteristics, among others, can aid courts in determining whether FACA applies. *See AAPS*, 997 F.2d at 914 ("In order to implicate FACA, the President, or his subordinates, must create an advisory group that has, in large measure, an organized structure, a fixed membership, and a specific purpose."); *Nader*, 396 F. Supp. at 1233 n.4 (suggesting that FACA may apply where a group was initiated by a federal official, meets regularly, and has a fixed membership, defined or specific purpose "of providing advice regarding a particular subject," and "organizational structure (*e.g.*, officers) and a staff") (quoting OMB Memorandum ¶ 4(a)(1), 38 Fed. Reg. 2306, 2307 (Jan. 23, 1973) (setting forth standards for FACA implementation)). However, these factors, while potentially useful, are not sufficient for determining the existence of a FACA advisory committee. Rather, they are only tools that a court may use to analyze the determinative question of whether a group was in a position to render collective advice on issues of public policy.

What is clear from the case law is that, for an individual to be considered a FACA committee member, he or she must have a "vote in, or if the committee acts by consensus, a veto

over the committee's decisions." *In re Cheney*, 406 F.3d at 728; *see also Cheney*, 542 U.S. at 393 (Stevens, J., concurring) (noting that "only substantive participation" evidenced by "whether any non-Government employees voted on [committee] recommendations or drafted portions of the committee's report" would support a finding that non-government individuals were de facto committee members). This principle of a "vote" or "veto" in committee recommendations or decisions is premised on the notion that the committee is expected to make substantive group recommendations or decisions, and that it does so at the behest of the executive. Absent any indication that such a structure exists, there can be no FACA obligation.

### B. Plaintiff's Arguments

Applying these legal principles, the Court concludes that plaintiff's argument that the Infrastructure Council existed as a de facto advisory committee fails. Plaintiff is correct that four non-government individuals were designated for participation in the Infrastructure Council. In addition, as defendants' interrogatory responses confirm, there were ongoing discussions between non-government individuals and White House employees in January through July 2017. But, these discussions are not enough to support a finding of a de facto FACA committee, for there is no evidence that the discussions ever matured to the point that there were group discussions regarding infrastructure policy for the purpose of making group recommendations to the executive.

Plaintiff emphasizes the sheer number of meetings and other communications identified in defendants' interrogatory responses—thirteen over the course of five months. (*See* Pl.'s Supp. Opp'n at 3.) But the number of meetings is not dispositive, or even particularly probative, especially where, as here, many of these "meetings" were not meetings at all but simply email exchanges or phone calls, which apparently did not take place according to a regular schedule. *See, e.g.*, *Nader*, 396 F. Supp. at 1232, 1234 (holding that FACA did not "apply to all

15

amorphous, ad hoc group meetings").  Plaintiff notes that at least four of the meetings or

communications identified by defendants included all four purported members or their staffs:  a

"meeting" on March 22, 2017; "communications" in May 2017; "email communication" with

staff of all four men on July 6, 2017; and an email from Gribbin to all four men on July 20, 2017.

(*See* Pl.'s Supp. Opp'n at 4; Defs.' Resp. to Interrog. at 13-14.)  Again, this overstates the nature

of the discussions.  Only one of these four encounters was an in-person meeting of the entire

group.  (*See* Defs.' Resp. to Interrog. at 13 (identifying the March 22, 2017 meeting).)  Most of

the thirteen contacts appear to have been informal exchanges, arranged on an ad-hoc basis, often

including only one or two of the purported council members or their staffs.  (*See, e.g.*, *id.* at 14

(identifying a "series of emails" in May 2017 between "staff assistants" of LeFrak and Harris

and White House Office employees).)

      More importantly, plaintiff cannot prevail because the Infrastructure Council did not

develop to the point that it was "asked to render advice or recommendations, *as a group*."  *AAPS*,

997 F.2d at 913-14.  The issue of group advice has stymied FACA plaintiffs before.  In *Freedom

Watch*, another judge on this Court held that "stakeholder meetings" at which the executive

solicited input on healthcare policy did not give rise to a de facto FACA committee.  930 F.

Supp. 2d at 101-02 (granting summary judgment to the government).  Relying on declarations

submitted by defendants, the court found that "the stakeholder meetings [did] not meet the

qualifications of FACA because they solicited 'individual views' and a broad range of 'unique

perspectives and experiences' and the members 'were not asked to, and did not, provide advice

or recommendations as a group.'"  *Id.* at 101-02 (quoting a government declaration); *see also*

*AAPS*, 997 F.2d at 102; *Ctr. for Biol. Diversity*, 239 F. Supp. 3d at 224-25 (concluding that non-

federal scientists were not de facto FACA committee members because their input had been

sought on an individual basis).

Similarly, in this case the Infrastructure Council was never in a position to provide group policy recommendations. Rather, the group engaged in "preliminary discussions" regarding "how such a council would operate and what the mission of such a council would be." (Cordish Decl. ¶ 5.) These discussions included topics such as:

> what sectors of infrastructure would be represented in the council's membership; what the council's mission would be, particularly given that the White House was engaged in its own efforts in the area of infrastructure policy; whether the White House would provide financial support to the council; whether the council would have a dedicated staff; what federal entity would provide administrative support to the council; what the end product of the council's work would be.

(Defs.' Supp. Br. at 3-4 (quoting Defs.' Resp. to Interrog. at 11-12).) Any group decisions or recommendations pertained to planning the anticipated committee. (*See* Defs.' Resp. to Interrog. at 12 ("Discussions in the period prior to July 19, 2017, when the President issued Executive Order 13805, focused on many of the administrative issues that ultimately were addressed in the Executive Order. . . ."); *see also* EO 13805 § 4, 82 Fed. Reg. at 34383 (describing the planned council's mission and focus areas).[3]) The next step was anticipated to be the drafting of a formal charter, which would describe the committee's "operation and the responsibilities of its members in greater detail," but this step was not finalized because EO 13805 was revoked. (Cordish Decl. ¶¶ 6, 8.) Defendants also indicate that their review identified "no meeting at which a group recommendation or group advice regarding infrastructure policy was proposed by or on behalf of, or solicited from, a group including two or more of" the alleged committee members. (Defs.' Resp. to Interrog. at 10.)

---

[3] *See id.* ("The Council shall study the scope and effectiveness of, and make findings and recommendations to the President regarding, Federal Government funding, support, and delivery of infrastructure projects in several sectors, including surface transportation, aviation, ports and waterways, water resources, renewable energy generation, electricity transmission, broadband, pipelines, and other such sectors as determined by the Council.").

Plaintiff has retreated from the argument it made prior to the revocation of EO 13805, and now it contends that the council's purpose was to advise on what the mission and scope of the planned committee should be. Plaintiff, however, is incorrect that such discussions are sufficient to trigger FACA. Plaintiff cites no authority for its assertion that logistical discussions, including discussions of how to meet the statutory requirement that a committee charter be executed and filed before FACA meetings may be held, *see* 5 U.S.C. app. 2 § 9(c), should have taken place "within the government before initiating the FACA process," rather than "outsource[ing] all the critical analysis and decision-making regarding the existence, work, and scope of the Council." (Pl.'s Supp. Opp'n at 6.) But, as defendants note in reply, the General Services Administration, which implements FACA, follows regulations that include an exemption for meetings "convened solely to gather information, conduct research, or analyze relevant issues and facts in preparation for a meeting of the advisory committee, or to draft position papers for deliberation by the advisory committee. . . ." (Defs.' Supp. Reply at 6 n.5 (quoting 41 C.F.R. 102-3.160(a)).)

The most reasonable reading of FACA permits initial meetings—including meetings with non-government individuals—to determine the scope and mission of an advisory council before FACA applies. Thus, the language of EO 13805, which broadly identifies the would-be committee's planned areas of focus, reflects the planning communications that had taken place. *See* 82 Fed. Reg. at 34383; Defs.' Resp. to Interrog. at 12-13 ("While some preliminary discussions identified specific infrastructure policy issues, such discussion was for the purpose of identifying topics that would be listed as areas of focus in the description of the council's mission that would be included in the Executive Order.").

Plaintiff also incorrectly argues that two communications that occurred after the issuance of EO 13805—an email from Mr. Gribbin to the four alleged committee members on July 20,

2017, and a conference call on July 27, 2017—conclusively prove that the group's communications went beyond "preliminary discussions." (*See* Pl.'s Supp. Opp'n at 7 (citing Defs.' Resp. to Interrog. at 14).) These communications "addressed what would be entailed in complying with FACA; who should be invited to join the council and how potential members would be vetted; how the members of the council, once it was formed, would address potential conflicts of interest; and what should be included in the council's charter." (Defs.' Resp. to Interrog. at 13.) There is thus no indication that either communication was anything but preliminary in nature.

Plaintiff mounts various other arguments in an effort to work around the fact that the Infrastructure Council never was actually in a position to develop or render group policy advice. Chief among these arguments is the theory that FACA "applies to the provision of group advice of all kinds, not just policy advice." (Pl.'s Supp. Opp'n at 6.) This gloss on the relevant case law is overbroad. Courts have held that FACA can apply to "narrative summaries of scientific information" rather than strictly "policy recommendations." *Heartwood v. U.S. Forest Serv.*, 431 F. Supp. 2d 28, 34-35 (D.D.C. 2006); *see also Nw. Forest Res. Council*, 846 F. Supp. at 1013 (finding that FACA applied to a group of "technicians" brought together to "supply decisionmakers with data"). However, the cases cited by plaintiff involved the provision, as a group, of information intended to directly inform executive policymaking.[4] Despite plaintiff's protestations, there can be no FACA obligation without some nexus between the group's purpose and the executive's policymaking goals. *See Judicial Watch, Inc. v. Clinton*, 76 F.3d at 1234 (holding that FACA did not apply to a group formed to advise the President on the permissibility

---

[4] *See Heartwood*, 431 F. Supp. 2d at 35 (noting that the committee's "drafts and . . . assessment provide the framework, context and information that the [agency] will rely on in making policy decisions"); *Nw. Forest Res. Council*, 846 F. Supp. at 1013 (noting that the committee at issue did render policy advice to the executive, although that fact was not dispositive).

of "methods to solicit funds for his legal expenses," because the group did not render "public policy advice."). The purpose of any group discussions that did occur never progressed from the preliminary work of establishing a FACA committee to the actual work of such a committee, for EO 13805 was revoked before the group was ever in a position to "render collective advice or produce any other type of collaborative work product." *Freedom Watch*, 930 F. Supp. 2d at 101.

For the same reasons, plaintiff's reliance on a case from another jurisdiction for the proposition that FACA relief is "appropriate before an advisory committee has completed its function," is inapposite. (*See* Supp. Opp'n at 6 (citing *Seattle Audubon Soc'y v. Lyons*, 871 F. Supp. 1291, 1309 (W.D. Wash. 1994), *aff'd sub nom. Seattle Audubon Soc'y v. Moseley*, 80 F.3d 1401 (9th Cir. 1996)).) In *Seattle Audubon*, the plaintiff had asked the court to order FACA compliance, via injunctive relief, after a committee's report, which made policy recommendations, had been reviewed and acted upon by the executive. *See id.* at 1309-10. The court noted that it may be appropriate to order FACA compliance while an advisory committee is still active, but "once a committee has served its purpose, courts generally have not invalidated the agency action even if there were earlier FACA violations." *Id.* at 1309. This principle does nothing to solve plaintiff's central problem, which is that the Infrastructure Council never became operational as a FACA advisory committee.

Plaintiff also argues that the Administration made policy decisions and took actions that "mirror" suggestions made by members of the Infrastructure Council. (*See* Am. Compl. ¶ 36 (discussing, for example, a White House "fact sheet detailing ways it intended to reduce project permitting time from ten years to two years," Executive Orders aimed at reducing permitting times for infrastructure projects, and the revocation of the Federal Flood Risk Management Standard).) To the extent that the Administration's actions reflect advice allegedly received from LeFrak or others, there is no evidence that the Administration's policy course was influenced by

group recommendations from the Infrastructure Council. Even assuming *arguendo* that the facts suggest a causal relationship, there is no reason to believe that any recommendations were made as a group, rather than by LeFrak or others as individuals. *See, e.g.*, *AAPS*, 997 F.2d at 915 (explaining that FACA does not "cover every instance when the President (or an agency) informally seeks advice from two or more private citizens").

Plaintiff's allegations detail other purported Infrastructure Council meetings not among the thirteen "preliminary discussions" identified in defendants' responses. Plaintiff alleges, based on contemporaneous news reports, that at least three other "encounters and meetings occurred," including (1) a February 18, 2017 meeting between LeFrak and President Trump to discuss construction of a wall on the Mexican border; (2) a March 8, 2017 meeting on infrastructure at the White House, with LeFrak, Roth, Harris, Ford, Secretary Chao, and possibly Jared Kushner; and (3) a June 7, 2017 speech by President Trump on infrastructure in Cincinnati, attended by LeFrak, Gribbin, and Cabinet members. (Am. Compl. ¶ 33.) These additional events do not give rise to FACA obligations because they did not involve solicitation or provision of group advice on infrastructure policy. The February 18 meeting was between the President and Mr. LeFrak in his individual capacity, and the March 8 meeting involved individuals with no connection to the Infrastructure Council (such as Elon Musk and Lynn Scarlett) and "involved the president hearing views of individuals, not the group advice of an infrastructure advisory council." (Defs.' Supp. Reply at 9.) Mr. LeFrak's attendance at a speech by the President is also of no import; the allegations do not indicate that any advice was solicited, but even if it had been, it would have been from LeFrak on an individual basis. (*See id.*) On the record before the Court it is clear that any recommendations by LeFrak or others are not, as plaintiff argued before the Court ordered jurisdictional discovery, "more . . . plausibly construed

as recommendations made on behalf of the Council." (Opp'n at 14.) Rather, the record supports the inference that no group advice was expected or rendered at these encounters.

Finally, plaintiff points to contemporaneous press accounts, prior to the issuance of EO 13805, which suggest that Infrastructure Council members considered themselves to be advisory committee members.[5] The statements do not demonstrate that a FACA committee was operational. Rather, they are consistent with the evidence in the record that the group had been convened for preliminary planning activities, and at most the designated individuals gave advice on infrastructure policy not as a group, but as individuals. Indeed, some of plaintiff's own sources strongly suggest that it was mutually understood that the FACA advisory committee had not yet been established. One account, for example, quotes LeFrak stating that the group's "assignment is to advise" the President on infrastructure spending, but immediately goes on to state that "LeFrak isn't discussing the council further because *it hasn't been formed yet*, said his spokesman, Steve Solomon." (Mulholland & Niquette, *Trump Ties to Infrastructure Advisers Roth, LeFrak Run Deep*, Bloomberg News (Feb. 15, 2017) (emphasis added).)

These contemporaneous accounts thus lend support to the Court's finding that no FACA committee was established or utilized, and, as a result, the Court lacks subject-matter jurisdiction over plaintiff's claims.[6]

_____

[5] *See, e.g.*, Am. Compl. ¶ 28(c) (LeFrak describing himself as an "advisor"); *id.* ¶ 28(a) (LeFrak stating in February 2017 that "[p]art of our assignment is to advise him [President Trump] as best we can on the merits of these different things"); *id.* ¶ 28(b) (Roth stating in February 2017 that he and LeFrak had been asked "to be an advisor to him and the administration with respect to infrastructure matters"); *id.* ¶ 29 (Secretary Chao describing the four men as "volunteers . . . finding the best way to build our infrastructure for the future").

[6] Plaintiff's amended complaint asks the Court to grant relief pursuant to the Administrative Procedure Act and mandamus relief pursuant to 28 U.S.C. § 1361, both on the basis of alleged FACA violations. Because the Court has concluded that the Infrastructure Council was not a de facto FACA committee, plaintiff does not have informational standing to bring these claims. Nor can plaintiff have organizational injury, as it argues it does, where no FACA obligation existed and thus no legal injury occurred. *See League of Women Voters of U.S. v. Newby*, 838

## II.    PLAINTIFF'S MOTION TO COMPEL

Plaintiff also argues that, if the Court determines there is insufficient evidence to find that a de facto advisory council existed, the Court should refrain from granting defendants' motion to dismiss but, instead, it should compel further discovery.  "The district court retains 'considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction,' but it must give the plaintiff 'ample opportunity to secure and present evidence relevant to the existence of jurisdiction.'"  *Phx. Consulting Inc.*, 216 F.3d at 40 (quoting *Prakash v. Am. Univ.*, 727 F.2d 1174, 1179-80 (D.C. Cir. 1984).  "In order to avoid burdening a sovereign that proves to be immune from suit, however, jurisdictional discovery should be carefully controlled and limited. . . ."  *Id.* (citing *Foremost-McKesson, Inc. v. Islamic Repub. of Iran*, 905 F.2d 438, 449 (D.C. Cir. 1990)).

Plaintiff contends that the interrogatory responses are insufficient because (1) the government fails to demonstrate that it undertook sufficient efforts to fully respond to the interrogatories and (2) the responses fail to comport with Federal Rule of Civil Procedure 33, which requires that "[t]he person who makes the answers [to interrogatories] must sign them," Fed. R. Civ. P. 33(b)(5), and in doing so must "have a basis for signing the responses and for thereby stating on behalf of the [party] that the responses are accurate."  (Pl.'s Supp. Opp'n at 17 (quoting *Shepherd v. Am. Broadcasting Cos., Inc.*, 62 F.3d 1469, 1482 (D.C. Cir. 1995)).)

---

F.3d 1, 8 (D.C. Cir. 2016) (providing that an organization can have "organizational standing" based on injury caused by actions that impaired the organization's activities).

Defendants also argue that their motion to dismiss should be granted under several additional theories—plaintiff's claims are unripe or moot, plaintiff fails to establish the Court's jurisdiction over their mandamus claims against the President, and plaintiff fails to state a claim under the APA upon which relief can be granted.  (*See* Mot. at 24-30.)  Because the Court grants defendants' motion to dismiss for lack of subject-matter jurisdiction, the Court need not address these additional arguments.

After the Court ordered defendants to respond to limited interrogatories for purposes of jurisdictional discovery, defendants conducted a "review of calendar records and e-mail of the individuals within the White House Office and Department of Transportation, other than the President himself, who have been identified by Defendants as likely to have had meetings with any of the [alleged council members]." (Defs.' Resp. to Interrog. at 9.) Defendants also "consult[ed] with those individuals to the extent feasible," including by reaching out to Gribbin and Cordish, who no longer work at the White House. (*Id.*) Plaintiff contends that these descriptions do not provide sufficient details (*e.g.*, about the method used to search email and calendar records) to establish that the search was reasonable.

Given the Court's "latitude" in overseeing jurisdictional discovery, *Phx. Consulting*, 216 F.3d at 40, and the general mandate to "control[] and limit[]" jurisdictional discovery against the executive, *id.*, the Court finds defendants' responses to be adequate. They answer the questions posed by the Court; notably, they clarify the nature of the "preliminary discussions" at the heart of the jurisdictional question under review. Defendants were not required to explain every detail of their search process; rather, the adequacy of their response is held to a reasonableness standard. *See, e.g.*, *Prasad v. George Washington Univ.*, 323 F.R.D. 88, 93 (D.D.C. 2017) (quoting Fed. R. Civ. P. 26(g) committee note) (noting that what constitutes a "reasonable" discovery response "is a matter for the court to decide on the totality of the circumstances")); *see also Freedom Watch*, 930 F. Supp. 2d at 103 (denying request for additional discovery pursuant to Fed. R. Civ. P. 56(d) because plaintiff failed to "specif[y] what facts it intends to discover to rebut the government's evidence").

Plaintiff also argues that the Verification appended to the responses, signed by White House Information Technology Director Herndon, is deficient because it explicitly states that the "White House Office cannot warrant the complete accuracy of these interrogatory responses

based on personal knowledge because [Cordish and Gribbin] no longer work for the government and are outside the White House's control." (Defs.' Resp. to Interrog. at 16.) Plaintiff also contends that Herndon's assertion that White House Office staff "undertook a process to ensure the accuracy . . . to the best of their ability" by consulting with Cordish and Gribbin and "searching and reviewing" records, including calendar entries and emails, is insufficient because under Rule 33 Herndon must verify the accuracy of the government's response, not merely verify that a "process" was undertaken. Rule 33(b)(5) requires that the person giving interrogatory responses must sign them, and Herndon did so. He also has "a basis for signing" them and for stating that they are accurate, *Shepherd*, 62 F.3d at 1482, as he describes the reasonable efforts that were made to satisfactorily answer the Court's interrogatories. The government thereby has adequately satisfied the basic requirements of Rule 33.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss, ECF No. 14, will be granted. Plaintiff's motion in the alternative to compel, ECF No. 31, will be denied.


ELLEN SEGAL HUVELLE
United States District Judge

Date: December 10, 2018